**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**JEREMY STOCKSTILL**                                                                    **PLAINTIFF**

**VS.**                                                   **CIVIL ACTION NO.: 1:16cv00004(HSO)(JCG)**

**CITY OF PICAYUNE, ET AL.**                                                        **DEFENDANTS**

**DEFENDANT THE CITY OF PICAYUNE'S RESPONSE MEMORANDUM IN
OPPOSITION OF MOTION FOR PRELIMINARY INJUNCTION**

**PRELIMINARY STATEMENT**

Plaintiff Jeremy Stockstill's request for a preliminary injunction against Defendant the

City of Picayune, Mississippi should be denied.  "The Constitution does not guarantee unlimited

freedom to speak on government property."  *See Bronx Household of Faith v. Bd. of Educ. of the

City of New York*, 492 F.3d 89, 91 (2d Cir. 2007) (citing *Cornelius v. NAACP Legal Defense &

Educ. Fund*, 473 U.S. 788, 799 (1985)).  At issue are valid time, place, or manner restrictions

applicable to a Festival held two times per year in Picayune.  Preliminary injunctive relief is an

"extraordinary remedy" to which Stockstill simply is not entitled in this case.  *See Bluefield

Water Ass'n v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) ("We have cautioned

repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted

unless the party seeking it has 'clearly carried the burden of persuasion[.]'").

**BACKGROUND**

Picayune, Mississippi is located in Pearl River County.  Bryan Dawsey is the Chief of

Police, Chad Dorn is a Captain, and Gary Wilton is a Lieutenant.[1]  Chad Prestridge and Josh

---

[1]      Chief Dawsey Declaration, Ex. A.

Maidenbaum are former Picayune Police Officers.[2]

In October 2008, Picayune adopted a noise ordinance.[3]  The ordinance is modeled after a Dallas, Texas ordinance approved by the Fifth Circuit in *Medlin v. Palmer*, 874 F.2d 1085 (5th Cir. 1999).[4]  The ordinance prohibits "noises interfering with [the] public peace and comfort[,]" specifically "any loud and raucous noise in the city which is offensive to the ordinary sensibilities of the inhabitants of the city, which noise renders the enjoyment of life or property uncomfortable or interferes with public peace and comfort."[5]  If a person intends to engage in conduct violating the ordinance, he or she must seek pre-approval from the Police Chief in the form of a variance.[6]

Picayune Main Street, Inc. is a non-profit corporation[7] whose mission is "to preserve the historic character and integrity of the downtown commercial and residential district and to enhance the culture and quality of life through active community involvement."[8]  Its Director is Reba Beebe.[9]  "Main Street is committed to sponsoring programs which fulfill charitable goals: Historic preservation, community education and lessening the burden of local government."[10]

Twice a year, once in the Spring and once in the Fall, Main Street operates the Picayune Street Festival, a two-day event that is located on East and West Canal Streets and on a portion of Main Street.[11]  Attached as Exhibit F is a Street Festival Map.  Side streets are blocked off, and only pedestrian traffic is allowed within the Festival.[12]  Exhibit G is photos from the

---

[2]  *Id.*
[3]  Noise Ordinance, Ex. B.
[4]  *Compare id. with Medlin*, 874 F.2d at 1087 n.1.
[5]  Noise Ordinance, Ex. B.
[6]  *Id.*
[7]  *See* Secretary of State "Business Details," Ex. C.
[8]  Picayune Main Street's "About Us" Website Documents,  Ex. D.
[9]  Beebe Declaration, Ex. E.
[10]  *Id.*; Picayune Main Street's "About Us" Website Documents, Ex. D.
[11]  Beebe Declaration, Ex. E; Chief Dawsey Declaration, Ex. A.
[12]  Beebe Declaration, Ex. E.

PD.18752145.1

Festival, which show the flow of pedestrian traffic. There are no gates or fences or other barriers that obstruct the areas directly adjacent to the Festival to anything besides vehicular traffic.[13] Main Street pays off-duty police officers to provide Festival security.[14]

The Festival is Main Street's primary source of funding.[15] Over 300 vendors ordinarily rent booths[16] from Main Street, with some of the vendors selling arts and crafts and others simply presenting items for display.[17] Many of the vendors are local business.[18] The Festival has music and local entertainment and children's events, such as fun jumps, pony rides, and a petting zoo.[19] In past years, the Festival has drawn as many as 35,000 people.[20]

Main Street's vendor application distinguishes between "information" vendors and "food" vendors.[21] The price for a 10 x 20 "information" space is $125.00.[22] Vendors agree to abide by Main Street's rules, which in part provide that "[v]endors must remain in the designated space to hand out information and cannot walk around handing out printed info."[23]

Stockstill is affiliated with Shadow of the Almighty, a Christian church that has been in Picayune since 2009.[24] The church's pastor is Chris Weaver.[25] Members of the church, including Stockstill, engage in what they call "hellfire preaching" throughout Picayune.[26] Sometimes the church members use amplification devices and other times they do not.[27]

---

[13]     Chief Dawsey Declaration, Ex. A.
[14]     Beebe Declaration, Ex. E.
[15]     *Id.*
[16]     Sectioned off locations are considered "booths." Vendors are responsible for bringing their own tables, tents, or the like. *Id.*
[17]     Picayune Main Street's "Street Festival" Website Documents, Ex. H.
[18]     Beebe Declaration, Ex. E.
[19]     *Id.*
[20]     Beebe Declaration, Ex. E.
[21]     Application, Ex. I.
[22]     *Id.*
[23]     *Id.*; Festival Rules, Ex. J.
[24]     Shadow of the Almighty Web Pages, Ex. K.
[25]     *Id.*
[26]     *Id.*
[27]     Video Recordings, Ex. L (conventionally filed).

PD.18752145.1

Attached as Exhibit L are recordings of the church's preaching in Picayune. During downtown events, Shadow of the Almighty members frequently congregate near the railroad right-of-way, which is approximately 20 feet away from the Festival.[28]

At times, Shadow of the Almighty has rented a booth at the Festival.[29] The last time was in November 2013.[30] Other Christian churches frequently rent booths at the Festival as well.[31] At the last Festival, seven different Christian organizations rented booths, including First United Methodist Church; St. Paul Lutheran Church; Gideons International; Amazing Savior Church; St. Barnabas Anglican Church; Bikers Against Child Abuse; and First Presbyterian Church.[32]

This case grew out of the Spring 2015 Festival, which was held on March 28 and March 29. Prior to the Festival, Stockstill applied for a sound ordinance variance with Chief Dawsey.[33] Chief Dawsey granted the variance on condition that Stockstill remain in his "designated area" and that Stockstill's noise not reach the "loud and raucous" level identified in the ordinance.[34] It was Chief Dawsey's understanding that Stockstill knew his designated area to be the railroad right-of-way.[35]

During the Festival, Director Beebe received complaints about the distribution of literature outside of booths.[36] Beebe requested that Prestridge, who was off-duty working as a private security guard for Main Street, handle the complaints.[37] Prestridge informed two politicians that they could not distribute literature inside the Festival outside of a booth;

---

[28]     Chief Dawsey Declaration, Ex. A; Photos from Festival, Ex. G.
[29]     Beebe Declaration, Ex. E.
[30]     *Id*.; Weaver Application, Ex. M.
[31]     Beebe Declaration, Ex. E.
[32]     List of Church Vendors, Ex. N.
[33]     *See* Variance attached as Ex. B to Stockstill's preliminary injunction motion.
[34]     *Id*.
[35]     Chief Dawsey Declaration, Ex. A.
[36]     Beebe Declaration, Ex. E.
[37]     *Id*.

PD.18752145.1

Prestridge also informed Stockstill's group that they could not distribute literature inside the Festival outside of a booth.[38]

Stockstill's group initially was unwilling to comply with Prestridge's request.[39] Instead, the group engaged Prestridge and other off-duty officers working security at the Festival about what they believed their rights to be.[40] The only on-duty officer Stockstill's group interacted with was Lieutenant Wilton who indicated that the group should leave if they intended to continue distributing literature inside the Festival.[41] During the confrontation, Prestridge also told Stockstill's group that they could not use anything to amplify their voice.[42] According to Stockstill, the group eventually "packed up and went home for fear of arrest."[43]

This lawsuit followed in January 2016, with a video tape of the March 28, 2015 incident attached to a preliminary injunction motion. Stockstill claims that "Picayune maintains [an] on-going policy" of providing the Main Street organization an unconstitutional "heckler's veto,"[44] but that simply is not true. Restricting Stockstill from using an amplification device inside the Festival, as well as prohibiting Stockstill from distributing literature inside the Festival outside the confines of a booth, does not violate the First Amendment.

Picayune intends to enforce the following rules at future Festivals:[45] With respect to distributing literature, individuals may not distribute literature inside of the Festival unless they do so from the confines of a rented booth. Individuals may, however, distribute literature from the public streets and sidewalks directly outside of the Festival. With respect to sound amplification, individuals may not use amplification devices inside of the Festival without a

---

[38]     *See* Recording attached as Ex. F to Stockstill's preliminary injunction motion.
[39]     *Id*.
[40]     *Id*.
[41]     *Comapre id*. *with* Chief Dawsey Declaration, Ex. A.
[42]     *See* Recording attached as Ex. F to Stockstill's preliminary injunction motion.
[43]     Pl. Br. at 7.
[44]     *Id*. at 8.
[45]     Chief Dawsey Declaration, Ex. A.

sound ordinance variance. The Police Chief, however, will consider variances for designated areas in close proximity to the Festival. These rules are reasonable time, place, or manner restrictions that are constitutionally permissible.

## ARGUMENT & AUTHORITIES

This court has acknowledged the stringent nature of the preliminary injunction standard. *See, e.g, RW Dev., LLC v. Cuningham Group Architecture, Inc.*, 2012 WL 3258782, *2 (S.D. Miss. 2012). In *RW Development, LLC*, it was explained that "[i]njunctive relief, particularly in the preliminary stages of litigation, requires an <u>unequivocal showing</u> of the need for relief to issue." *See* 2012 WL 3258782 at *2 (emphasis added) (citation omitted). Put simply, "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Id*. (quoting *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985)).

Stockstill has not come close to satisfying the stringent standard governing his motion. To obtain a preliminary injunction, the movant "must demonstrate each of the following: 1) a substantial likelihood of success on the merits; 2) a substantial threat that failure to grant the injunction will result in irreparable injury; 3) the threatened injury must outweigh any damage that the injunction will cause to the adverse party; and 4) the injunction must not have an adverse effect on the public interest." *Id*. (citing *City of Meridian v. Algernon Blair, Inc.*, 721 F.2d 525, 527 (5th Cir. 1983)). Stockstill's motion fails for various different reasons.

### A. The limitations are constitutional time, place, or manner restrictions.

When, as here, a plaintiff challenges speech restrictions, the <u>location</u> where the speech occurs dictates the level of scrutiny to be applied. *See Fairchild v. Liberty Indep. Sch. Distr.*, 597 F.3d 747, 757 (5th Cir. 2010). Though streets such as East and West Canal Streets and Main Street in Picayune are generally considered "public" forums, such forums may temporarily be

converted to "non-public" forums when the government provides exclusive use to a private entity. *See, e.g., Sistrunk v. City of Strongsville*, 99 F.3d 194, 196 (6th Cir. 1996) (holding that a public park had temporarily been converted to a non-public forum subject to only minimal constitutional protection, where the city provided exclusive use of park to political candidate's campaign committee).[46] Picayune nonetheless does not challenge Stockstill's characterization of the Festival being held on a public forum for purposes of this motion, since the restrictions at issue plainly are constitutional under the public forum analysis.

Indeed, both the limitations on distributing literature and on the use of voice amplification are "reasonable time, place, or manner restrictions" that comport with the First Amendment. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). To constitute a permissible time, place, or manner restriction, the limitation must: (1) be content-neutral, (2) be narrowly tailored to serve an important or substantial government interest, and (3) preserve ample alternative channels of communication. *Id*. Each of these components are satisfied in this case.

Two Supreme Court cases pervade the analysis. In *Ward*, the Supreme Court upheld a licensing restriction on sound amplification in a city park as a permissible time, place, or manner restriction. *Id*. at 803 ("The city's sound-amplification guideline is narrowly tailored to serve the substantial and content-neutral governmental interests of avoiding excessive sound volume and providing sufficient amplification within the bandshell concert ground, and the guideline leaves open ample channels of communication. Accordingly, it is valid under the First

---

[46]      *See also United Auto Workers v. Gaston Festivals, Inc.*, 43 F.3d 902, 910-11 (4th Cir. 1995) ("If a party obtaining a permit to use public property for a specific event were constitutionally required to admit unconditionally everyone seeking admission, it would be virtually impossible to hold the event for which the permit was obtained."); *Wickersham v. City of Columbia*, 371 F.Supp.2d 1061, 1064-65 (W.D. Mo. 2005) (explaining that, when the government turns "over a city park to a private organization [for a private event,] the private group merely has the use of public property and, therefore, could exclude whoever they wanted[,] even though the event is occurring on public land and open to the public").

Amendment as a reasonable regulation of the place and manner of expression."). Similarly, in *Heffron v. International Society for Krishna Consciousness, Inc.*, the Supreme Court upheld a rule requiring solicitation in a public fairground to take place only at assigned booths as a permissible time, place, or manner restriction. *See* 452 U.S. 640, 654 (1981) ("[W]e hold that the State's interest in confining distribution, selling, and fund solicitation activities to fixed locations is sufficient to satisfy the requirement that a place or manner restriction must serve a substantial state interest."). These decisions demonstrate, as a general matter, that the distribution and sound restrictions at issue in this case are presumptively constitutional under Supreme Court precedent.

*Content Neutral.* Both challenged limitations are content neutral. According to the Supreme Court, a prohibition is content neutral if it "places no restrictions on—and clearly does not prohibit—either a particular viewpoint or any subject matter that may be discussed by a speaker." *See Hill v. Colorado*, 530 U.S. 703, 719 (2000). Neither the limitation placed on Stockstill's distribution of literature nor the limitation placed on Stockstill's desire to use an amplification device has anything whatsoever to do with the substance his message.

Each limitation focuses solely on Stockstill's <u>method</u> of delivery. Main Street's written rules provide that "[v]endors must remain in the designated space to hand out information and cannot walk around handing out printed info."[47] Likewise, Picayune's noise ordinance prohibits certain "loud and raucous noise[.]"[48] These rules are content neutral because they do not draw distinctions based on a particular viewpoint. *See Frisby v. Schultz*, 487 U.S. at 474, 481-82 (1988) (finding a municipal ordinance prohibiting <u>all</u> picketing near a residence to be content-neutral because the government did not have to look at the content to determine where picketers

---

[47] Festival Rules, Ex. J.
[48] Noise Ordinance, Ex. B.

could demonstrate); *DA Mortgage, Inc. v. City of Miami Beach*, 486 F.3d 1254, 1266-69 (11th Cir. 2007) (finding noise ordinance constitutional, where ordinance did not disallow certain noises because of "particular viewpoints").

Significantly, Stockstill has presented no evidence that non-Christian speakers have been allowed to avoid the limitations. *See Fairchild v. Liberty Indep. Sch. Distr.*, 597 F.3d 747, 760 (5th Cir. 2010) ("There is no evidence that the [defendant] discriminates based on the view or identity of a given speaker."). The evidence instead shows that the rules apply to religious and non-religious organizations alike.[49] Many Christian-based organizations participate in the Festival and are required to confine their distribution of literature to the booths they rent just like all other vendors.[50] Politicians too have sought to pass out political literature outside of their booths but have been forbidden from doing so.[51] Stockstill's argument amounts to a request that his speech be given preferential treatment to the speech of others, but that is not something the Constitution requires. *See Startzell v. City of Philadelphia*, 533 F.3d 183, 198 (3d Cir. 2008) (explaining that, although the plaintiff "possess[es] a First Amendment right to communicate [his] message in a public forum," his "rights are not superior to the First Amendment rights of" the event organizers).

Other facts additionally contradict the claim that the restrictions are aimed at Stockstill's message. The very individual that Stockstill has sued in his personal capacity, Chad Prestridge, is an ordained minister who has in the past witnessed to patrons of the Festival along with Stockstill's pastor and who has attended the Shadow of the Almighty church himself.[52] It simply is not true that Picayune has discriminated against Stockstill because of his desire to preach a

---

[49]     Beebe Declaration, Ex. E; List of Church Vendors, Ex. N.
[50]     *Id.*
[51]     *See* Recording attached as Ex. F to Stockstill's preliminary injunction motion.
[52]     Prestridge Declaration, Ex. O.

PD.18752145.1

Christian message.  *See Marcavage v. City of Phila.*, 481 Fed. App'x 742, 746 (3d Cir. 2012) (upholding speech restriction, where "[t]here [wa]s no evidence from any of the events that the City relocated [the plaintiff] because it disagreed with the content of his speech").

Stockstill cannot satisfy his burden by complaining that his speech falls within the ambit of rules that he opposes, for the Constitution merely requires that the rules be applied evenhandedly.  *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994) ("[T]he fact that the [prohibition] covered people with a particular viewpoint does not itself render the [prohibition] content or viewpoint based.").  All of the evidence demonstrates that the literature distribution and sound amplification limitations imposed upon Stockstill are content neutral.

*Narrowly Tailored To A Significant Governmental Purpose.*  The literature distribution and sound amplification restrictions are narrowly tailored to serve significant governmental interests.  *See Ward*, 491 U.S. at 791.  Again, the Supreme Court in *Ward* and *Heffron* previously held that similar restrictions are constitutional speech limitations that pass the second prong of the time, place, or manner test.  *See id*. at 803 (sound amplification); 452 U.S. at 654 (literature distribution).

Post-*Ward* and post-*Heffron*, federal courts have identified literature distribution and sound amplification restrictions as the prototypical type of limitations that pass constitutional muster.  In *Teesdale v. City of Chicago*, 690 F.3d 829, 834-35 (7th Cir. 2012), for example, the Seventh Circuit acknowledged that "a municipality is able to impose reasonable content-neutral time, place and manner restrictions on any traditional public forum" and then explained that "[s]uch restrictions would include, for example, prohibiting someone from using a bullhorn during a public festival."  In another example, *Hynes v. Metro. Gov't of Nashville and Davidson Cnty.*, 667 F.2d 549, 550 (6th Cir. 1982), the Sixth Circuit explained that a Tennessee State Fair

rule "prohibiting literature distribution" beyond "the confines of a booth or display" was a constitutional time, place, or manner restriction that was "need[ed] to maintain the orderly movement of the crowd given the large number of exhibitors and persons attending the Fair."

Attached as Exhibit A is a declaration outlining particular governmental objectives. Among the interests are the public's comfort and enjoyment of the streets, the success of community events and local businesses, safety and protection, convenient flow of pedestrian traffic, noise reduction, litter control, and aesthetics. Picayune need only possess a single significant interest, but in this case there are many. *See Price v. City of Fayetteville*, 2013 WL 1751391, *5 (E.D. N.C. 2013) (declining to address second articulated interest because the first articulated interest sufficed).

Countless cases demonstrate that each of the just-referenced governmental interests are "significant." *See Heffron*, 452 U.S. at 650 (upholding literature distribution limitation to promote interest of orderly crowd movement and explaining that "it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective"); *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 806-07 (1984) ("[M]unicipalities have a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression."); *Ward*, 491 U.S. at 792 (upholding sound restriction in order "to control noise levels" and "retain the character" of the public property); *Marcavage*, 481 Fed. App'x at 747 (upholding distribution and sound limitations "in order to maintain public order"); *Spingola v. Village of Granville*, 39 Fed. App'x 978, 983-84 (6th Cir. 2002) (upholding ordinance limiting public speakers to designated areas during special events "to increase public safety during the festival; to ensure smooth traffic flow; and to balance free speech with the rights of persons attending the festival to be free from hindrance"); *Casey v. City of Newport*,

308 F.3d 106, 114 (1st Cir. 2002) ("We agree with the district court that the ban on amplification serves the City's interest in noise reduction[.]"); *One World One Family Now v. City and County of Honolulu*, 76 F.3d 1009, 1013 (9th Cir. 1996) (explaining that "[c]ities have a substantial interest in protecting the aesthetic appearance of their communities" and that "cities have a substantial interest in assuring safe and convenient circulation on their streets"); *Hynes*, 667 F.2d at 550 (upholding literature distribution restriction that "confine[d] [distribution to] a booth or display" because it was "need[ed] to maintain the orderly movement of the crowd given the large number of exhibitors and persons attending the Fair"); *Marcavage v. City of New York*, 918 F.Supp.2d 266, 271 (S.D. N.Y. 2013) ("the City has a significant interest in protecting the health, safety and welfare of its inhabitants from the potential dangers of sound amplifiers, including the possibility of amplifiers diverting the attention of pedestrians"); *Price*, 2013 WL 1751391 at *5-6 (holding government's interest "in maintaining orderly movement of Festival attendees" was sufficient to support literature distribution limitation); *Genco Importing Inc. v. City of New York*, 552 F.Supp.2d 371, 380 (S.D. N.Y. 2008) ("[t]he City has 'a substantial interest in protecting its citizens from unwelcome noise'") (internal citation omitted).

The attached declarations also demonstrate <u>why</u> the rules in question address the governmental concerns involved, specifically describing the character of the Festival and the type of occupancy therein. Of course Picayune "need not wait for misfortune to strike to demonstrate [that] the [restrictions] addresses legitimate governmental interests[.]" *See Sun–Sentinel Co. v. City of Hollywood*, 274 F.Supp.2d 1323, 1331 (S.D. Fla. 2003) (citation omitted); *see also Watkins v. City of Arlington*, 2014 WL 340804 0, *7 (N.D. Tex. 2014) ("Arlington need not wait for accidents to justify safety regulations[.]"). Allowing anyone and everyone to distribute literature and use amplification devices inside the Festival presents "real harms" that

the restrictions address "in a direct and material way." *See Turner Broad. Sys. Inc. v. FCC*, 512 U.S. 622, 664 (1994) (applying narrow tailoring requirement). To borrow the words of a Florida district court, "[i]t requires neither towering intellect nor an expensive 'expert' study to conclude" that limitations must be placed on certain activities during the Festival. *See News and Sun–Sentinel Co. v. Cox*, 702 F.Supp. 891, 900 (S.D. Fla.1 988) (citation omitted); *see also Burson v. Freeman*, 504 U.S. 191, 211 (1992) (explaining that "simple common sense" dictates "that some restricted zone around polling places is necessary to protect" voters from intimidation).

Here is the scene from a past Festival:



Consider what the Festival would look like if all patrons were permitted to do what Stockstill wants to do. *See Heffron*, 452 U.S. at 654 (explaining that "the inquiry must involve not only [the plaintiff], but also all other [individuals] that would be entitled to" engage in the

same activity).  If everyone was allowed to use their own amplification devices throughout the Festival, and if everyone was allowed to distribute literature outside of a booth throughout the Festival, chaos would ensue.  Main Street would be deprived of its primary revenue source since few, if any, individuals would have an incentive to rent a booth.  Patrons would be forced to dodge loud noises and literature throughout the Festival.  Given the inconvenience of having to do so, many disruptive confrontations could result.  If patrons accept the literature to avoid being placed in the uncomfortable position of declining, there is a strong possibility the literature would end up on the ground in short order.  All of these consequences support Picayune's position because the Supreme Court has made clear that the validity of restriction "depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." *See Ward*, 491 U.S. at 801.

Picayune has an overarching interest in promoting the success of its businesses and local events, such as the Festival.  Allowing Stockstill to jeopardize the future viability of the Festival by passing out literature without a booth and by using sound amplification within the Festival places his interests above those of Picayune, the Festival, and all citizens who wish to enjoy the Festival.  Again, the Constitution does not require that Stockstill be given such preferential treatment.  *See Startzell*, 533 F.3d at 198 (explaining that the plaintiff's "rights are not superior to the First Amendment rights of" others).

There is no requirement that Picayune's rules be the perfect solution for its articulated interests.  It is settled that, to satisfy the narrow tailoring test, the government need not prove that the challenged rules are the least intrusive means of promoting the  interests involved.  *See Ward*, 491 U.S. at 798-99.  Stated differently, so "long as the restriction promotes a substantial governmental interest that would be achieved less effectively without the restriction, it is

PD.18752145.1

sufficiently narrowly tailored." *See Serv. Emp. Int'l Union, Local 5 v. City of Houston*, 595 F.3d 588, 596 (5th Cir. 2010).[53]  It cannot reasonably be argued that the literature distribution and sound amplification restrictions are ineffective ways of promoting Picayune's interests.  *See One World One Family Now*, 76 F.3d at 1014 (explaining that it was enough that the restriction was "a 'valuable, but perhaps imperfect' means of addressing the targeted problem").

Underscoring the point is the *Price* case, where the court denied a preliminary injunction request aimed at a rule prohibiting the plaintiff from distributing religious literature outside the confines of a booth at a festival.  *See* 2013 WL 1751391 at 10.  Just as Stockstill does in this case, the plaintiff relied on *Saieg v. City of Dearborn*, 641 F.3d 727 (6th Cir. 2011) to support his argument that the literature distribution ban was not narrowly tailored.  *Id.* at 7-9.  It was explained that *Saieg* was distinguishable because, rather than providing only the option of distribution from an information table, the plaintiff in *Price,* like Stockstill in this case*,* had the "option of renting a booth or distributing literature in Linear Park."  *Id.*

Ultimately, "[t]he crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time."  *See Knights of the Ku Klux Klan v. East Baton Rouge Parish Sch. Bd.*, 578 F.2d 1122, 1124 (5th Cir. 1978).  Using sound amplification devices inside the Festival and allowing literature distribution inside the Festival beyond the confines of a booth are activities that are incompatible with the streets Picayune has permitted for use during the Festival.

*Alternative Channels.*  Both the literature distribution and sound amplification restrictions leave Stockstill with ample alternative channels of communication.  *See Ward*, 491 U.S. at 791.

---

[53]     In this vein, the Supreme Court has warned that, in the context of determining whether the restriction supports the interest, courts must be cautious in second-guessing the city's judgment.  *See United States v. Albertini*, 472 U.S. 675, 689 (1985) ("The validity of such regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests.").

"[T]he alternative forum for communication does not have to be the speaker's first choice." *See Sonnier v. Crain*, 2012 WL 6020123, *2 (E.D. La. 2012). Nor does the alternative forum for communication have to be "one that provides the same audience or impact for the speech." *See Gresham v. Peterson*, 225 F.3d 899, 907 (7th Cir. 2000) (citing *Ward*, 491 U.S. at 802). These inadequate arguments are the only disadvantages Stockstill possibly can point to in support of his injunction request.

With respect to literature distribution, individuals may apply to rent a booth and hand out materials within its confines[54] or, alternatively, individuals may hand out materials directly outside of the Festival.[55] These are precisely the type of alternatives held to be constitutional by other courts. In *Spingola*, for example, the Sixth Circuit explained that an "alternative channel for speech has obviously been provided in the form of the designated speaking area within the festival" and also by the fact that the plaintiff "could stand anywhere outside the grounds of the festival if he so chose." *See* 39 Fed. App'x at 984-85. Likewise, in *Price*, the court highlighted the "option of renting a booth or distributing literature in Linear Park." *See* 2013 WL 1751391 at 7-9.

With respect to sound amplification, individuals may speak with an unamplified voice inside the Festival or seek a variance to use amplification within a close proximity at a designated area outside of the Festival.[56] These too are precisely the type of alternatives held to be constitutional by other courts. In *Medlin*, for example, the Fifth Circuit rejected a

---

[54] In his brief, it is stated that "[t]he booth option is not suitable either" because, "[t]o obtain a booth, Stockstill would have to pay a $125.00 fee." *See* Pl. Br. at 22. The authorities relied upon above, however, demonstrate that renting a booth is in fact a permissible alternative. *See also CAMP v. City of Atlanta*, 219 F.3d 1301, 1323-24 (11th Cir. 2000) (holding that a festival fee schedule for renting space was "narrowly tailored to serve the City's legitimate interest in covering the cost of supporting the outdoor festival and, therefore, [wa]s constitutionally permissible"); *Stonewall Union v. City of Columbus*, 931 F.2d 1130 (6th Cir. 1991) (upholding validity of $85 permit fee).

[55] Chief Dawsey Declaration, Ex. A.

[56] *Id.*

constitutional challenge to Dallas' sound ordinance and reasoned that "[i]t does not prohibit unamplified speech." *See* 874 F. 2d at 1090; *see also Pine v. City of West Palm Beach*, 2013 WL 5817651, *6 (S.D. Fla. 2013) (acknowledging unamplified speech as a sufficient alternative). Likewise, in *Hill*, the Supreme Court upheld a restriction that prohibited individuals holding signs from approaching other people near health facilities because the ability of the people to read the signs from a further distance provided a suitable alternative. *See* 530 U.S. at 726.

Stockstill plainly has effective, alternative avenues to promote his message both at and near the Festival. "In the 'ample alternatives' context, the Supreme Court has made clear that the First Amendment requires only that the government refrain from denying a 'reasonable opportunity' for communication." *See Menotti v. City of Seattle*, 409 F.3d 1113, 1141 (9th Cir. 2005) (citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 54 (1986)). Stockstill has available to him far <u>more</u> that what is even constitutionally required.

* * * *

The restrictions at issue satisfy the time, place, or manner test – that is, they are content-neutral, narrowly tailored to serve an important government interests, and preserve ample alternative channels of communication. *See Ward*, 491 U.S. at 791. Consequently, the restrictions are compatible with the First Amendment.

**B. The limitations do not constitute a heckler's veto.**

There is no merit to Stockstill's argument that Picayune has granted the Main Street organization a "heckler's veto." "A 'heckler's veto' is defined as 'an attempt by those who dislike a speaker to create such a disturbance that the speaker must be silenced.'" *See Gaughan v. City of Cleveland*, 212 Fed. App'x 405, 415 n.13 (6th Cir. 2007). There is no evidence whatsoever that Picyaune or Main Street dislikes Stockstill's Christian message, not the least of which is evidenced by the fact that Christian organizations frequently participate in the Festival

and from the fact that Picayune police officers themselves have had involvement with the Shadow of the Almighty church.[57]

While Stockstill correctly points out that courts have raised concerns about governmental entities granting private entities unbridled discretion to discriminate based on the content of speech, Picayune has granted no such authority to Main Street in this case. The restrictions at issue apply to everyone; they are not applicable only to Stockstill. By "removing any discretion by [Main Street] officials" to selectively apply the restrictions, there is no concern about a heckler's veto. *See Spingola*, 39 Fed. App'x at 985 (explaining that only "[w]here the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit, [is there] a risk that [the official] will favor or disfavor speech based on its content").

The Fifth Circuit has considered the precise argument Stockstill raises in his motion. In *Brazos Valley Coalition for Life, Inc. v. City of Bryan*, 421 F.3d 314, 326 (5th Cir. 2005), the plaintiff argued that a rule permitting "private property owners to reject a flag emplaced in the unimproved public right-of-way in front of their property on the basis of its content confer[ed] an unconstitutional 'heckler's veto.'" The argument was rejected, with the court explaining that, because the rule in question "restrict[ed] where any 'flag' may be placed," the rule did not "to any extent turn or depend on the content of what is displayed on the 'flag.'" *See* 421 F.3d at 326. Just as the plaintiff's argument was rejected in *Brazos Valley*, so too should Stockstill's argument be rejected here.

Stockstill's repeated reference to "unwritten" rules similarly is a red herring. Picayune plainly is entitled to enforce general laws, for instance violations of the noise ordinance or disorderly conduct, failure to comply, and criminal trespass laws, but there is no requirement that there be specific written rules contemplating everything that possibly could happen at the

---

[57] Beebe Declaration, Ex. E; Prestridge Declaration, Ex. O.

Festival in any event. It is well settled that "[t]he fact that a policy is not committed to writing does not of itself constitute a First Amendment violation." *See Lebron v. National R.R. Passenger Corp.*, 69 F.3d 650, 658 (2d Cir. 1995). Indeed, many courts have upheld unwritten restrictions as constitutionally permissible. *See, e.g., Faustin v. City & County of Denver,* 423 F.3d 1192, 1198 (10th Cir. 2005) (holding that an unwritten rule prohibiting activities on a highway overpass did not violate the First Amendment rights of an abortion protestor who claimed that the policy curtailed her protesting activities on the walkway of the highway overpass); O*ccupy Minneapolis v. County of Hennepin*, 866 F.Supp.2d 1062 (D. Minn. 2011) (holding that the "[c]ounty's unwritten rules prohibit[ing] any chalking on Plaza property, on any topic," were constitutional).

To the extent Stockstill believes Picayune is forbidden from relying upon constitutional time, place, or manner restrictions until after he already has violated the restrictions, such a belief is wrong as well. In *Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 434 (6th Cir. 2009), the plaintiffs "argue[d] that denying a request ahead of time, rather than waiting to regulate the speech after hearing it, impose[d] a[n] unconstitutional] 'prior restraint' on the speaker[.]" The Sixth Circuit flatly rejected the argument, explaining that *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002) holds otherwise. The literature distribution and sound amplification rules are constitutional restrictions that Picayune need not wait to apply until after Stockstill disrupts the Festival.

### C. Stockstill has not demonstrated an unconstitutional municipal policy.

Stockstill's lawsuit seeks to remedy alleged past and future violations of his First Amendment rights. Such relief only may be granted via 42 U.S.C. § 1983, which "demands that the plaintiff show that [an] objectionable municipal policy was the 'moving force' behind the plaintiff's injury." *See Brown v. Bryan Cnty.*, 219 F.3d 450, 457 (5th Cir. 2000). Stockstill

PD.18752145.1

cannot show that any official Picayune policy caused the alleged constitutional violation on March 28, 2015 or, for all of the reasons explained previously, that any official Picayune policy will cause constitutional violations at future Festivals.

The chief complaints from Stockstill are that he was prohibited from passing out literature and prohibited from utilizing a voice amplification device at the Spring 2015 Festival.[58] In his brief, he attributes both prohibitions to Picayune Main Street, Inc., a "private organization."[59] Stockstill does not contend that the City of Picayune has any written policy granting Main Street carte blanche at the Festival. Instead, his argument appears to be that Picayune has some unwritten policy of doing whatever Main Street says.[60]

Stockstill offers no evidence whatsoever in support of his flawed argument. Because cities are not subject to *respondeat superior* liability, the acts of individual employees do not establish a municipal policy for purposes of 42 U.S.C. § 1983. *See Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002). Only "official policymakers," those who have "the responsibility for making law or setting policy in any given area of a local government's business[,]" establish municipal policy. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 125 (1988). Stockstill does not contend that he interacted with any Picayune policymakers on March 28, 2015, so any statements made by individual officers at the Spring 2015 Festival are entirely irrelevant. *See Lofton v. Adams Cnty., Miss.*, 2008 WL 4192039, *4 n.4 (S.D. Miss. 2008) (explaining that, although "[t]he actions of the other officers would have been relevant in a suit against the officers in their individual capacities[,]" "only the acts of policymakers are relevant for the purposes of analyzing municipal liability"). Indeed, except for a brief interaction with

---

[58] Pl. Br. at 17-21.
[59] *Id*. at 2.
[60] *Id*. at 12-13.

Lieutenant Wilton, all of the other officers who interacted with Stockstill were off-duty working private security detail for Main Street.[61]

A district court in this circuit recently considered similar facts in *Grisham v. City of Ft. Worth*, 2015 WL 3901612 (N.D. Tex. June 24, 2015). In *Grisham*, a GLTB group "conduct[ed] a festival in General Worth Square in downtown Fort Worth[,]" and the plaintiff "entered the part of General Worth Square where the festival was taking place [and] handed out gospel tracts." *See* 2015 WL 3901612 at *1. After the plaintiff was told under threat of arrest that he must leave the festival and its surrounding area because the GLBT group "had a permit for the festival[ ] and controlled activity in the area[,]" the plaintiff sued under 42 U.S.C. § 1983 for an alleged violation of his First Amendment rights. *Id*. at *1-3. It was held that the plaintiff had demonstrated neither that the individual officer "participated in establishment of any policy, practice, custom, or procedure that led to [the] decision to instruct plaintiff to stay on the opposite side of [the street] to disseminate whatever he wished to disseminate" nor that "whatever restrictions [the] City's policies, practices, customs, or procedures placed on speech on City premises occupied by a permittee pursuant to . . . the festival in question [were] not constitute reasonable time, place, and manner restrictions[.]" *Id*. at *4-5.

The facts of *Rundus v. City of Dallas*, 634 F.3d 309 (5th Cir. 2011) are instructive also. In *Rundus*, the plaintiff alleged that a private corporation operating a fair on public property violated his First Amendment rights by prohibiting him from distributing religious literature unless he rented a booth. *See* 634 F.3d at 312-13. The Fifth Circuit rejected the plaintiff's First Amendment claim against the City of Dallas, explaining that the challenged restrictions were attributable to the private corporation operating the fair and not to the City of Dallas, even though the City of Dallas made significant financial contributions to the private organization

---

[61] Beebe Declaration, Ex. E; Chief Dawsey Declaration, Ex. A.

such as paying a portion of the officers' wages who policed the fair. *Id*. at 312-15. It held that the plaintiff had not sufficiently demonstrated "state action," i.e. that an official municipal policy led to the alleged constitutional deprivation. *Id*.

Stockstill presents an even weaker case here than the plaintiffs in *Grisham* and *Runyan*. In *Grisham*, the officers alleged to have violated the plaintiff's First Amendment rights were on-duty while, in this case, all of the officers except for Lieutenant Wilton were off-duty working as private security guards.[62] And in *Runyun*, the municipality paid a portion of the off-duty officers' wages while, in this case, Picayune did not.[63] Plus, there is no concern of future interaction with Prestridge or Maidenbaum because they no longer are even employed by the Picayune Police Department.[64] *See Leatherwood v. Whetsel*, 2012 WL 4586934, *4 (W.D. Okl. 2012) (holding that plaintiff-prisoner failed to show substantial likelihood of success on the merits, where officer alleged to have mishandled his mail was "no longer employed with the State").

Stockstill's request for a preliminary injunction must be denied because he has not demonstrated that Picayune adheres to an unconstitutional policy. The rules that Picayune intends to enforce at the next Festival appear in the declaration attached as Exhibit A to this brief and are plainly constitutional permissible time, place, or manner restrictions that comport with the First Amendment. Any prior actions taken by non-policymakers are entirely irrelevant to this motion.

---

[62]    *Id*.
[63]    *Id*.
[64]    Chief Dawsey Declaration, Ex. A.

PD.18752145.1

**D.  At a minimum, Stockstill's preliminary injunction request is premature.**

A longstanding tenet for adjudicating preliminary injunction motions is that "'courts should be extremely cautious' about issuing a preliminary injunction[.]"  *See, e.g., Committee of Central American Refugees v. INS*, 795 F.2d 1434, 1441 (9th Cir. 1986).  That is especially so where, as here, the parties appear to have very different perspectives on both the facts and law.  *See Marshall Durbin Farms, Inc. v. National Farmers Org., Inc.*, 446 F.2d 353 (5th Cir. 1971) (acknowledging that "[c]ourts are more cautious about invoking the extraordinary remedy of the preliminary injunction where critical facts are in dispute"); *Price*, 2013 WL 1751391, *4 ("'On application for preliminary injunction, the court is not bound to decide doubtful and difficult questions of law[.]").  At bottom, Stockstill's request is inappropriate at this early stage of the litigation.

Much of Stockstill's preliminary injunction brief complains about Picayune's failure to respond to the letter attached as Exhibit H to his motion, in which he demanded that Piacyune provide "written assurance – no later than three weeks from [May 29, 2015] – that Picayune w[ould] let him enter public sidewalks and streets inside and close to festival areas to distribute literature and dialogue during festival times."  Picayune did not respond to the letter but has made clear in this response what Stockstill's options are for future Festivals.

An analogous case is *Morrel v. City of Shreveport*, 536 Fed. App'x 433 (5th Cir. 2013).  In *Morrel*, "a self-described 'street preacher'" using a bullhorn near a casino was order by Shreveport police to relocate, saying that the street preacher "was on private land."  *See* 536 Fed. App'x at 433-34.  After doing so, the street preacher, who had videoed the incident, sent a letter to the city stating that he had in fact been on public property and "inquiring whether he would need a permit for his street preaching activities, even if on public land."  *Id*.  Shreveport did not respond to the letter but made its position clear through affidavits after the street preached filed

suit.  *Id*. at 435.  The district court denied the street preacher's request for a preliminary injunction, and the Fifth Circuit affirmed because "the City ha[d] provided [the street preacher] with his requested guidance as to complying with [Shreveport's] municipal ordinances."  *Id*.

Because the restrictions at issue in this case are constitutionally permissible, Stockstill is not likely to succeed on the merits.  Accordingly, his preliminary injunction motion should be denied.  In the alternative, Stockstill's motion should be denied because it is premature.

## CONCLUSION

For all of these reasons, Stockstill's preliminary injunction motion should be denied.

Dated: January 27, 2016.

Respectfully submitted,

PHELPS DUNBAR LLP

BY:   /s/ *G. Todd Butler*

Gary E. Friedman, MB #5532
G. Todd Butler, MB #102907
4270 I-55 North
Jackson, Mississippi 39211-6391
Post Office Box 16114
Jackson, Mississippi  39236-6114
Telephone: 601-352-2300
Telecopier: 601-360-9777
Email: friedmag@phelps.com
        butlert@phelps.com

## CERTIFICATE OF SERVICE

I certify that, on January 27, 2016, I electronically filed this response with the Clerk of the Court, using the CM/ECF system, which sent notification of such filing to the following counsel of record:

Nathan W. Kellum
Center for Religious Expression
699 Oakleaf Office Lane, Suite 107
Memphis, TN 38117

***ATTORNEY FOR PLAINTIFF***

*/s/ G. Todd Butler* _____
G. TODD BUTLER

PD.18752145.1